IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SCANDALE ASSOCIATED BUILDERS : No. 03cv1773
& ENGINEERS, LTD., :
:
     Plaintiff, : Judge Jones
:
  v. :
:
BELL JUSTICE FACILITIES CORP., :
:
     Defendant. :
:

## MEMORANDUM AND ORDER

### October 11, 2006

## THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

  Two Motions are pending before this Court.  First, Defendant, Bell Justice Facilities Corp. ("Defendant" or "Bell"), filed a Motion for Partial Summary Judgment (doc. 47) on March 31, 2006.  Second, Plaintiff, Scandale Associated Builders & Engineers, Ltd. ("Plaintiff" or "Scandale"), filed a Motion for Summary Judgment (doc. 49) on March 31, 2006.  On May 19, 2006, both Motions were dismissed without prejudice.  On August 23, 2006, this Court entered an Order enabling these Motions to be reasserted.  For the reasons that follow, the Motions shall be denied.

## PROCEDURAL BACKGROUND:

On or about September 10, 2003, Plaintiff filed a Complaint against Defendant in the Court of Common Pleas of Wayne County, Pennsylvania.  On October 6, 2003, pursuant to 28 U.S.C. § 1446, Defendant filed a Notice of Removal with this Court.  That same day, Defendant filed a Motion to Dismiss Count III of the Complaint that was granted by Order of December 5, 2003.  (Rec. Doc. 12).  The remaining counts of Plaintiff's Complaint assert breach of contract (Count I), "unresolved additional direct cost issues" and delay and impact costs (Count II), and interest and penalties purportedly due under the Pennsylvania Contractors and Subcontractors Payment Act (Count IV).

Defendant did not file an Answer to Plaintiff's Complaint or raise any affirmative defenses.  The time for filing or amending pleadings expired May 31, 2004.  Discovery proceeded and closed.  On March 31, 2006, Plaintiff and Defendant filed respective Motions for Summary Judgment that were briefed by the parties.

On April 24, 2006, Defendant filed a Motion for Leave to File an Answer, which was granted by Order of May 19, 2006.  (Rec. Doc. 63).  That Order also re-opened discovery for a period of sixty (60) days and dismissed the Motions for Summary Judgment without prejudice.  On May 31, 2006, Defendant filed an Answer.  (Rec. Doc. 65).  Subsequently, the period of discovery closed.

On August 23, 2006, this Court entered an Order allowing the previously

filed and briefed Motions for Summary Judgment to be reasserted.  (Rec. Doc. 71).

The Motions are therefore ripe for disposition.

**STANDARD OF REVIEW:**

Summary judgment is appropriate if "there is no genuine issue as to any

material fact and . . . the moving party is entitled to judgment as a matter of law."

Fed.R.Civ.P. 56(c); see also Turner v. Schering-Plough Corp., 901 F.2d 335, 340

(3d Cir. 1990).  The party moving for summary judgment bears the burden of

showing "there is no genuine issue for trial."  Young v. Quinlan, 960 F.2d 351, 357

(3d Cir. 1992).  Summary judgment should not be granted when there is a

disagreement about the facts or the proper inferences that a fact finder could draw

from them.  See Peterson v. Lehigh Valley Dist. Council, 676 F.2d 81, 84 (3d Cir.

1982).

Initially, the moving party has a burden of demonstrating the absence of a

genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323

(1986).  This may be met by the moving party pointing out to the court that there is

an absence of evidence to support an essential element as to which the non-moving

party will bear the burden of proof at trial. See id. at 325.

Rule 56 provides that, where such a motion is made and properly supported,

the non-moving party must then show by affidavits, pleadings, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue for trial.  See Fed. R. Civ. P. 56(e).  The United States Supreme Court has commented that this requirement is tantamount to the non-moving party making a sufficient showing as to the essential elements of their case that a reasonable jury could find in its favor.  See Celotex, 477 U.S. at 322-23 (1986).

It is important to note that "the non-moving party cannot rely upon conclusory allegations in its pleadings or in memoranda and briefs to establish a genuine issue of material fact."  Pastore v. Bell Tel. Co. of Pa., 24 F.3d 508, 511 (3d Cir. 1994) (citation omitted).  However, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true."  Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992)(citations omitted).

Still, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  "As to materiality, the substantive law will identify which facts are material."  Id. at 248.  A dispute is

4

considered to be genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

**STATEMENT OF RELEVANT FACTS:**

The facts in this matter are largely disputed by the parties.  We are presented with detailed disputed factual summaries and extensive discovery material.  We will not attempt to conduct a piecemeal examination of each fact presented by the parties, but will discuss the relevant factual background necessary to resolve the pending Motions.  We will, where necessary, view the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party in our analysis of the pending Motions.

Bell was the general contractor on a project for the construction of the United States Penitentiary/Federal Prison Camp at Canaan, Pennsylvania ("Project").  (Rec. Docs. 48-3, ¶ 3; 54, ¶ 3).  The owner of the Project is the United States Department of Justice/Federal Bureau of Prisons ("FBOP").  (Rec. Docs. 48-3, ¶ 3; 54, ¶ 3).  On or about January 4, 2001, Scandale and Bell entered into a fixed-price written subcontract agreement (the "Subcontract") pursuant to which Scandale agreed to perform concrete work on Bell's Project.  (Rec. Doc. 1-3, Ex. A, ¶ 1).

The parties agree that Scandale contracted initially to provide a complete

and operable cast-in-place concrete system (docs. 48-3, ¶ 6; 54, ¶ 6) in exchange

for a price of $5,413,000.00 (doc. 1-3, Ex. A, ¶ 3) and that the Subcontract

contained a "flow down" provision pursuant to which Scandale assumed all rights

and obligations toward Bell that Bell assumed toward the FBOP. (Rec. Docs. 48-

3, ¶ 5; 54, ¶ 5; 1-3, Ex. A, ¶ 1).

However, the parties' accord with respect to the effect of Subcontract terms

ends there. Bell highlights those provisions that enable Bell to withhold 10%

retention on partial payments until, "among other things, Scandale provid[ed]

evidence that it had 'paid in full all bills for labor and materials'" (doc. 48-3, ¶ 7

(quoting doc. 1-3, Ex. A, ¶ 3)); to order Scandale to work overtime, with additional

payment for labor only if Scandale was not responsible for falling behind schedule;

and to modify Scandale's work. (Rec. Doc. 48-3, ¶ 8-10). Bell also notes that the

Subcontract provided time as the exclusive remedy in the event of delay beyond

Scandale's control. (Rec. Doc. 48-3, ¶ 10). Paragraph nineteen (19) of the

Subcontract states:

> If the Subcontractor [Scandale] shall be delayed in the commencement,
> prosecution or completion of the work or shall be obstructed or hindered in
> the orderly progress of the work by any act, neglect or default of the
> Contractor [Bell], the Owner [FBOP], the Architect, another contractor or
> subcontractor or by any cause beyond the control of the Subcontractor, then
> the time fixed for completion of the work shall be extended for a period
> equivalent to the period of the delay incurred by the Subcontractor as
> determined by the Contractor . . . The Subcontractor expressly agrees not to

6

make, and hereby waives, any claim for damages on account of any delay, obstruction or hindrance for any cause whatsoever, including but not limited to the aforesaid cause, and agrees that its sole right and remedy in the case of any delay, obstruction or hindrance shall be an extension of the time fixed for completion of work unless and to the extent that the Contractor recovers the same from the Owner.

(Rec. Doc. 1-3, Ex. A, ¶ 19).

Scandale, on the other hand, refers this Court to the Subcontract's choice of law provision, which provides that the Subcontract be construed in accordance with the law of "'where the project is located.'" (Rec. Doc. 50, ¶ 7 (quoting Rec. Doc. 1-3, Ex. A, ¶ 22)). Because the Project is located in Pennsylvania, Pennsylvania law governs. (Rec. Doc. 50, ¶ 7). Thus, Scandale alleges that the Subcontract's provisions are not dispositive because Pennsylvania does not give effect to exculpatory provisions when a defendant has actively delayed and hindered the performance of the contract (doc. 53 at 11), as Scandale alleges that Bell has. (Rec. Doc. 50, ¶ 23).

Both parties agree that Scandale encountered numerous delays in its work on the Subcontract. (Rec. Docs. 50, ¶ 23-24; 59, ¶ 23). For example, from on or about June 18, 2001 through on or about August 8, 2001, earthwork on the Project was suspended due to stop work orders issued by state and federal agencies. (Rec. Docs. 48-3, ¶ 14; 54, ¶ 14).

However, the parties disagree as to the causes of, responsibility for, and

effects of the stop work orders.  Scandale claims that Bell frustrated Scandale's ability to perform under the Subcontract and caused substantial damages to Scandale.  (Rec. Doc. 50, ¶ 24).  Scandale cites a non-exclusive list of twelve alleged acts and/or omissions by Bell, including such items as earthwork delays resulting in shut down from June 18, 2001 through August 8, 2001, change in performance conditions, re-sequencing of work areas, and failure of Bell to properly supervise and coordinate the work of all subcontractors.  (Rec. Doc. 50, ¶ 23).

Several of Scandale's exhibits appear to support its allegations.  In his affidavit, Mark Paradise, the secretary of Scandale, discusses the problems that Scandale encountered during its work on the Project.  (Rec. Doc. 51, Ex. 2, ¶ 6-9).  Paradise indicates that various on-site problems resulted in a twenty-six (26) week delay in the Project, and that as a result of that and other delays, Scandale suffered substantial impact costs above the original contract price.  (Rec. Doc. 51, Ex. 2, ¶ 6-9).  Scandale's Request for Equitable Adjustment Financial Summary, which provides that it does not include any unpaid balance due on the Subcontract or any unpaid retainage being held by Bell, requests an additional $1,441,089.  (Rec. Doc. 51, Ex. 5).  Scandale also cites a December 21, 2001 Memorandum from the Project Manager that indicates that "extending your finish date is not an option."

(Rec. Doc. 51, Ex. 6).

Bell denies Scandale's allegations that Bell is responsible for the delays. (Rec. Doc. 59, ¶ 23).  Bell claims that Scandale's allegations are unsupported by the record and that Scandale and other actors caused some of the delays.  (Rec. Doc. 59, ¶ 23).  Further, Bell claims that Scandale was not precluded from working during the earthwork shutdown, and that, in fact, Scandale continued to construct footings during the alleged shutdown.  (Rec. Doc. 59, ¶ 23).

The report prepared by Bell's expert, Patrick W. Brannon, P.E., corroborates Bell's denials.  Mr. Brannon suggests that Scandale's allegations are unfounded. (Rec. Doc. 59-5, Ex. 3 at 10-17).  He notes that Bell provided Scandale all of the time necessary to perform its work, that Scandale waived delay damages under the Subcontract, and that Bell has not received compensation from the FBOP for delays associated with the earthwork stoppage.  (Rec. Doc. 59-5, Ex. 3 at 11). Further, Mr. Brannon indicates that Scandale has not demonstrated how a 57 day work stoppage resulted in a 411 day delay, and that, in fact, Bell afforded Scandale the opportunity to work on multiple aspects of the Project concurrently to make up time, but that Scandale failed to take advantage by not providing sufficient workers or supervision.  (Rec. Doc. 59-5, Ex. 3 at 11-12).

The parties agree that because of problems that arose during the course of

Scandale's work under the Subcontract, Bell and Scandale executed several Change Orders containing releases.  (Rec. Docs. 48-3, ¶ 11; 54, ¶ 11).

Once again, however, parties disagree as to the effect of these Change Orders.  Bell alleges that Scandale attempted to enter a reservation of claims in Change Order Nos. 6-9, but Bell did not accept the reservation.  (Rec. Doc. 48-3, ¶ 13).  Bell also alleges that Change Orders Nos. 6-9 are irrelevant because they were voided by the parties' execution of Change Order Nos. 10 and 11.  (Rec. Doc. 48-3, ¶ 13).  Indeed, Change Order No. 11, executed on June 18, 2003, plainly states:

> This change order represents full and final settlement for time and money for the work required in this change, including all delays, labor inefficiency and other impact costs associated with this change.  The subcontractor hereby releases the contractor from any and all liability under this subcontract for further equitable adjustment attributed to such factors or circumstances giving rise to this modification.

(Rec. Doc. 48, Ex. 2, Change Order No. 11 at 3).

Scandale denies all of Bell's allegations regarding the effect of the Change Orders.  (Rec. Doc. 54, ¶ 11-13).  Although Paradise indicates that numerous Change Orders executed by Bell and Scandale increased the contract price by $334,688.50, to a total of $5,747,688.50 (doc. 51, Ex. 2, ¶ 6-9), Scandale asserts that its recovery of delay, acceleration, and impact costs is not barred by the June 18, 2003 Change Order's release language because Bell's actions interfered with

Scandale's performance and Bell specifically requested and offered to pay

Scandale for its impact and acceleration costs.  (Rec. Doc. 54, ¶ 11-12).

The parties agree (docs. 48-3, ¶ 18; 54, ¶ 18) that on August 26, 2002,

Scandale sent Bell a letter containing Scandale's  "'<u>preliminary</u> cost estimate' for

the delays and impacts to our work due to the earthwork stoppage," in the amount

of $1,183.482.  (Rec. Doc. 48-11, Ex. 7)(emphasis in original).  Bell emphasizes

that the letter was sent more than one year after the June 2001 shutdown.  (Rec.

Doc. 48-3, ¶ 18).  Scandale counters by alleging that on several prior occasions, it

had advised Bell that it was reserving its right to impact costs until the extent of

those costs were known.  (Rec. Doc. 54, ¶ 18).

Scandale and Bell agree that Scandale submitted a Request for Equitable

Adjustment ("REA") of the Subcontract price because of the problems that arose

during its performance under the Subcontract.  (Rec. Docs. 50, ¶ 29; 59, ¶ 29).  The

REA, prepared by Scandale's expert (doc. 54, ¶ 20), Bruce Garnant, provides that

it does not include any unpaid balance due on the Subcontract or any unpaid

retainage being held by Bell and requests an additional $1,441,089.  (Rec. Doc. 51,

Ex. 5).  Bell alleges that Scandale's REA is erroneous and unsupported.  (Rec.

Doc. 59, ¶ 31).

Scandale also alleges that Bell billed the FBOP $11,474,000.00 for

Scandale's work on the project and that Bell submitted, and was compensated based on, several of Bell's own REA's to the FBOP.  (Rec. Doc. 50, ¶ 32-33). Scandale further alleges that Bell may have been compensated for delay damages and impact costs incurred by Scandale.  (Rec. Doc. 50, ¶ 32-33).  The record upon which Scandale relies indicates that Bell submitted several REA's to the FBOP and did receive payments by the FBOP.  (Rec. Doc. 51, Ex. 3 at 51-52).  However, the Ruether deposition cited by Scandale (doc. 51, Ex. 3 at 51-52) neither clearly indicates whether Bell's REA requested payment for Scandale's work nor whether Bell received additional compensation from the FBOP for Scandale's work.  (Rec. Doc. 51, Ex. 3 at 51-52).

In fact, Bell's response to Scandale's allegations tends to demonstrate otherwise.  Bell alleges that because Bell's contract with the FBOP was based on a fixed fee, the FBOP and Bell agreed on an overall schedule of values for all worked performed under their contract, and the schedule of values between the FBOP and Bell was independent of and predated Scandale's Subcontract, "the schedule of values that the Government agreed to with BELL under the prime contract is irrelevant an[d] immaterial to the Scandale's Subcontract and any of Scandale's claims thereunder. "  (Rec. Doc. 59, ¶ 32).  Bell accurately notes that the rest of Ruether's aforementioned sentence, as relied upon by Scandale to

support its allegations, actually indicates that the FBOP's additional payments were "based on the approved schedule of values," suggesting that the FBOP may not have made any REA payments based on Scandale's work.  (Rec. Doc. 59-12, Ex. 10 at 52-53).

On November 11, 2002, Bell responded in writing to Scandale's REA.  (Rec. Docs. 48-3, ¶ 20; 54, ¶ 20).  Bell's letter claimed that ¶ 19 of the Subcontract barred Scandale's claims and that Scandale's submission of "a huge REA long after the delay . . . makes multiple issues indistinguishable from each other giving the BELL company no ability to verify, mitigate, or recoup the claimed impacts." (Rec. Doc. 48-12, Ex. 8).  Scandale denies that allegation.  (Rec. Doc. 54, ¶ 20).

The parties agree that on or about April 24, 2003, the FBOP and Bell entered into a Contract Modification, #23, that granted Bell a one hundred and seven (107) calendar day extension.  (Rec. Docs. 48-3, ¶ 21; 54, ¶ 21).  Bell alleges that the FBOP did not award any additional compensation for the extension (doc. 48-3, ¶ 22), and cites Modification #23 in support.  (Rec. Doc. 59-11, Ex. 9).  Modification #23, indeed, indicates that no additional compensation was awarded therein.  (Rec. Doc. 59-11, Ex. 9).

However, Scandale denies the allegation that FBOP did not award additional compensation for the 107 day extension (doc. 54, ¶ 22), and Scandale's denials are

also supported by the record.  On March 25, 2002, Bell submitted a Time Impact

Analysis of Added E&S Controls Canaan USP/FPC requesting an $1,558,258.42

increase in the contract price.  (Rec. Doc. 54-2, Ex. 8).  Further, Mr. Reuther

testified that Bell received a final REA, pursuant to Modification No. 24, in the

amount of $1,500,000.  (Rec. Doc. 54-2, Ex. 3 at 50).

Notably, the parties even dispute which facts are *undisputed*.  For example,

Scandale claims that it is "undisputed that there is an unpaid balance of

$287,307.64 due SCANDALE under said CONTRACT since substantial

completion by SCANDALE on June 27, 2003 and no later than acceptance of

substantial completion by the FBOP on July 22, 2003."  (Rec. Doc. 50, ¶ 14).

Nevertheless, Bell responds that it "denies that the contract balance has been due

Scandale as of either date set forth in ¶ 14."  (Rec. Doc. 59, ¶ 14).

Similarly, Bell alleges that "Scandale has further admitted that it elected to

pursue its claims under the REA in lieu of submitting the final waiver and release."

(Rec. Doc. 48-3, ¶ 24).  Indeed, in his deposition, Mark Paradise admitted that it

would be "fair to say the reason Scandale would not submit final application No.

25 and include a final waiver was because it wanted to pursue the R.E.A."  (Rec.

Doc. 48-15, Ex. 11 at 6).  However, although Scandale admits that it refused to

sign the Final Release and Waiver, Scandale denies that it elected to pursue its

14

claims under the REA in lieu of submitting the Final Release and Waiver.  (Rec. Doc. 54, ¶ 24).

Although both parties agree that Scandale refused to sign the Final Release and Waiver (docs. 48-3, ¶ 24; 54, ¶ 24), they disagree as to the circumstances surrounding Scandale's submission of its Final Application for Payment.  Bell maintains that on or about July 9, 2003, Bell asked Scandale to submit its Final Application for Payment and the requisite Final Release and Waiver (doc. 48-3, ¶ 23), and Bell's July 9, 2003 fax to Mark Paradise appears to support this allegation. (Rec. Doc. 48-14, Ex. 10).  However, upon a closer look, Scandale's response that it actually submitted its Final Application for Payment on June 27, 2003, which was returned by Bell on July 9, 2003, requesting a $.02 correction and submission of Final Release and Waiver (doc. 54, ¶ 23), appears credible.  Scandale's Application and Certificate for Payment, dated June 27, 2003, requests payment of the 5% retainage, totaling $287,307.64.  (Rec. Doc. 51, Ex. 9).

Further, Bell alleges that contrary to ¶ 3 of the Subcontract, Scandale has not provided documentation to Bell demonstrating that Scandale has paid all of its bills.  (Rec. Doc. 48-3, ¶ 25).  Scandale denies Bell's claim, alleging that the only document that Bell has requested and not received is the Final Release and Waiver Form.  (Rec. Doc. 54, ¶ 25).  Scandale maintains that it cannot provide that

document because it would eliminate Scandale's REA.  (Rec. Doc. 54, ¶ 25).

Additionally, Scandale alleges that Bell failed to timely pay Scandale as required

under the Subcontract.  (Rec. Doc. 50, ¶ 16).  Bell denies that it is required to pay

Scandale under the Subcontract because Scandale has admitted that it has not

performed all of the Subcontract requirements.  (Rec. Doc. 59, ¶ 16).

## DISCUSSION:

Both of the instant motions seek the granting of summary judgment.

Plaintiff seeks granting of Plaintiff's Motion for Summary Judgment as to its

claims in their entirety.  (Rec. Doc. 49-1 at 2).  On the other hand, Defendant

argues that summary judgment should be granted for it with respect to Counts IV

and II, the Pennsylvania Contractor Subcontractor Payment Act, 73 P.S. § 501 et

seq., and delay damages, respectively, because there is no genuine issue of material

fact and Defendant is entitled to judgment as a matter of law.  (Rec. Doc. 47-1).

### A.    The Pennsylvania Contractor Subcontractor Payment Act Claim

Plaintiff argues that it is entitled to relief under the Pennsylvania

Contractor Subcontractor Payment Act ("PCSPA"), 73 P.S. § 501 et seq.  The

PCSPA provides that "[p]erformance by a subcontractor in accordance with the

provisions of contract shall entitle the subcontractor to payment from the party

with whom the subcontractor has contracted."  73 P.S. § 507(a).  Such payments

must be paid 14 days after "receipt of each progress or final payment or 14 days after receipt of subcontractor's invoice, whichever is later." 73 P.S. § 507(c).  If such payments are not timely made, the subcontractor is also entitled to interest, see 73 P.S. § 507(d), a penalty fee, see 73 P.S. § 512(a), and reasonable attorney fees, see 73 P.S. § 512(b).

The PCSPA enables both contractors and subcontractors to recover payment as provided by contract when they have fully performed under the contract.  See 73 P.S. § 504.  Accordingly, the PCSPA's definition of the terms is integral.  A "subcontractor" is "[a] person who has contracted to furnish labor or materials to, or has performed labor for, a contractor or another subcontractor in connection with a contract to improve real property," 73 P.S. § 502 (emphasis added), and a "contractor" is "[a] person authorized or engaged by an owner to improve real property," 73 P.S. § 502 (emphasis added).  An "owner" is defined as "[a] person who has an interest in the real property that is improved and who ordered the improvement to be made.  The term includes successors in interest of the owner and agents of the owner acting with their authority."  73 P.S. § 502 (emphasis added).  Finally, a "person" is defined as "[a] corporation, partnership, business trust, other association, estate, trust foundation or a natural individual."  73 P.S. § 502.

17

The parties dispute the applicability of the PCSPA.  Plaintiff argues that the PCSPA applies here as Plaintiff is a subcontractor and Bell is a contractor under the PCSPA, because the FBOP is an "owner" under the PCSPA and falls within the "other association" category in the definition of "person."  (Rec. Doc. 55 at 11).  Thus, Plaintiff asserts that it is entitled to all applicable remedies under the PCSPA.  (Rec. Doc. 53 at 10).

Defendant argues that the FBOP, as an agency of the federal government, does not fall within the definition of "person" set out in the PCSPA, thus rendering the PCSPA inapplicable to the instant dispute.  (Rec. Doc. 48 at 11).  Defendant relies on the statutory interpretation maxim of *expressio unius*, the express inclusion of government agencies in other statutes, and the availability of the Miller Act to support its interpretation.  (Rec. Doc. 48 at 12).  Defendant argues that its narrow interpretation of "owner" and "person" does not deprive plaintiffs in this and similar situations a remedy because of the applicability of the Miller Act, see 40 U.S.C. § 3131 et seq.

The issue of whether the PCSPA applies when the federal government contracted for construction work is one of first impression in Pennsylvania courts.  Specifically, Pennsylvania courts have not yet considered whether the federal government is a "person" as defined by the PCSPA.  Thus, this Court must attempt

18

to predict the interpretation of the PCSPA as to that question by Pennsylvania courts.  See Gares v. Willingboro Township, 90 F.3d 720, 725 (3d Cir. 1996) (indicating that in the absence of relevant state case law, federal courts are to predict how the state's highest court would rule).

When making such a determination, the first logical question that must be addressed is whether the Miller Act, which was designed to protect subcontractors and suppliers working under federal contracts by affording them the equivalent of a mechanic's lien, preempts the PCSPA.  See 40 U.S.C. § 3301 et seq.  This question too is one of first impression in the Third Circuit.  We must accordingly look to sister Circuits to see if any persuasive authority on these issues exists.

Several other federal courts outside of the Third Circuit have considered whether the Miller Act preempts remedies afforded contractors, subcontractors, and suppliers under state law.  At least one district court has concluded that the Miller Act preempts such state law remedies.  See United States ex rel. Pensacola Constr. Co. v. St. Paul Fire & Marine Ins. Co., 710 F. Supp. 638 (W.D. La. 1989). In Pensacola Construction Company, the court relied on F.D. Rich Co. v. United States ex rel. Indus. Lumber Co., 417 U.S. 116 (1974), when it concluded that the Miller Act preempts state remedies.  710 F. Supp. at 641 ("[i]t would be illogical for Congress to give exclusive jurisdiction over the Miller Act to federal courts and

then expect them to follow state law in interpreting it.").

However, the majority of the case law on this issue calls into question the conclusion in Pensacola Construction Company.  For example, United States ex rel. Don Siegel Construction Company v. Atul Construction Company, 85 F. Supp. 2d 414, 416 n. 1 (N.J. 2000) indicates that Pensacola Construction Company has been superseded by the Prompt Payment Act, 39 U.S.C. § 3901 et. seq.  Other courts have taken issue with Don Siegel Construction Company's reliance on the Prompt Payment Act, but have, nevertheless, found that the Miller Act does not preempt state law remedies.  See United States ex rel. Cal's A/C & Elec. v. Famous Constr. Corp., 220 F.3d 326, 328 (5th Cir. 2000).

Indeed, three Circuit Courts have concluded that the Miller Act does not preempt state law remedies.  In Cal's A/C & Elec., the case most factually similar to the instant case, the Fifth Circuit held that the Miller Act does not preempt state law remedies.  Id. at 328.  The subcontractor had won its Miller Act claim against a contractor and its surety and appealed the dismissal of its state law claim for attorney's fees.  Id. at 327.  The state statute being considered read:

> [i]f a contractor or subcontractor without reasonable cause fails to make any payment to his subcontractors and suppliers within fourteen consecutive days of the receipt of payment from the owner for improvements to an immovable, the contractor or subcontractor shall be liable for reasonable attorney fees for the collection of the payments due the subcontractors and suppliers.

Id. (quoting LA. REV. STAT. ANN. § 9:2784(C)).

Upon review of the Miller Act, the state statute enabling recovery of attorney fees, and F.D. Rich, the Fifth Circuit held that "F.D. Rich found no such barrier in the Miller Act in allowing Cal's to proceed on its Louisiana claim." Cal's A/C & Elec., 220 F.3d at 328.  It reasoned that "F.D. Rich . . . announced only that Miller Act claims themselves do not incorporate state law remedies such as attorney's fees; it did not read the Act to preclude the pursuit of state causes of action for fees in addition to Miller Act claims."  Id. at 327 (emphasis in original).

Two other Circuits have also held that the Miller Act does not preempt state law remedies based on F.D. Rich Co., 417 U.S. 116 (1974).  See K-W Indus. v. Nat'l Sur. Corp., 855 F.2d 640 (9th Cir. 1988); United States ex rel. Sunworks Div. of Sun Collector Corp. v. Ins. Co. of N. Am., 695 F.2d 455 (10th Cir. 1982).  In K-W, the Ninth Circuit held that application of a state's "unfair insurance claims practices law to Miller Act sureties" was not preempted by the Miller Act.  855 F.2d at 643.  Although the state statute considered differs from the one at issue in the instant case, the court's reasoning demonstrates its applicability here.  The Ninth Circuit saw no conflict between the state statute and the Miller Act's purpose, protection of suppliers of goods and services on federal projects.  Id.

In the instant case, not only is there no conflict between the PCSPA and the

21

Miller Act, but a key purpose of the two statutes is the same.  Both statutes aim to protect subcontractors that have fully performed.  See Sunworks Division, 695 F.2d at 457 ("the Supreme Court has explained that 'the Miller Act was designed to provide an alternative remedy to the mechanics' liens ordinarily available on private construction projects . . .'" (emphasis in original)); R.W. Sidley, Inc. v. United States Fid. & Guar. Co., 319 F. Supp. 2d 554, 558 (W.D. Pa. 2004) ("[t]he purpose of this statute [PCSPA] is to protect contracting parties, including subcontractors, by assuring good faith performance of contracts.").  Thus, although only dicta, the Ninth Circuit's finding that the "Miller Act simply provides the equivalent of a mechanic's lien; it does not supplant any other remedies the supplier may have against any party involved in a federal construction project," K-W Indus., 855 F.2d at 643, is instructive here.

Indeed, the Ninth Circuit's holding in K-W referenced Sunworks Division, 695 F.2d 455.  The Ninth Circuit agreed with the "Tenth Circuit's observation that the Miller Act, like the mechanic's lien it replaces, 'is not the exclusive remedy in regard to the obligation which such lien secures,' but rather, 'is separate from and independent of any in personam rights . . . which the supplier might have against the owner, a contractor, or a subcontract, by way of a contract or otherwise.'"  K-W Indus., 855 F.2d at 643 (quoting Sunworks Div., 695 F.2d at 458 (citations and

internal quotations omitted)).  In <u>Sunworks Division</u>, a subcontractor's supplier

was suing the contractor under the common law theory of <u>quantum meruit</u>.

Although, as in <u>K-W</u>, the state cause of action differs from that in the instant case,

the Tenth Circuit's consideration of the Miller Act's purpose, as discussed in <u>F.D.</u>

<u>Rich</u>, renders this decision persuasive as well.

This Court recognizes that none of these Circuits' decisions are binding, but

we find their reasoning persuasive.  Both the PCSPA and the Miller Act have been

designed to protect subcontractors, and thus, as the Fifth, Ninth, and Tenth Circuits

have concluded, this Court holds that the Miller Act does not preempt the state law

remedy that Plaintiff seeks here.

Accordingly, this Court must next evaluate whether the PCSPA's definitions

of "owner" and "person" include the FBOP, a federal agency.  As Defendant

properly pointed out (doc. 48 at 11), statutory interpretation of the PCSPA is a

question of law that this Court can decide on a motion for summary judgment.

However, as previously noted, Pennsylvania courts have not yet interpreted the

PCSPA, <u>see</u> <u>Net Constr., Inc. v. C & C Rehab and Constr., Inc.</u>, 256 F. Supp. 2d

350, 357 n.8 (E.D. Pa. 2003), thus requiring this Court to attempt to ascertain how

they would decide.  <u>See</u> <u>Gares</u>, 90 F.3d at 725.  In so doing, particularly at this

stage of the litigation, the Court approaches this issue with some caution.

Although Defendant makes a creative argument that the FBOP does not qualify as an "owner" (doc. 48 at 11-12) as defined by the PCSPA, this Court finds that the FBOP may, indeed, be an "owner" within the PCSPA.  The Court reaches this conclusion based upon a number of grounds.  First, the definition of "person" in 73 P.S. § 502 is ambiguous because "other association," one "person" under the PCSPA, is not defined.  Second, the definition of "person" is ambiguous because although it does not expressly include the federal government, it does not expressly exclude it.  Thus, whether contracts in which the federal government is the owner fall within the PCSPA is unclear.

Where the words of a statute are ambiguous, courts may consider the purposes of the statute, its legislative history, and other sources to determine legislative intent.  Holland v. Marcy, 883 A.2d 449, 455 (Pa. 2005).  The PCSPA's purpose is protecting contracting parties, including subcontractors.  R.W. Sidley, Inc., 319 F. Supp. 2d at 558.  Given that the PCSPA was designed to protect subcontractors, "other association" may include the federal government when a subcontractor is seeking damages in a claim in which the federal government is the owner of the land upon which construction is being done.

Third, given the lack of clarity in this area and that finding otherwise would

leave plaintiffs in this situation[1] bereft of a remedy, this Court is reluctant to grant Defendant summary judgment on Plaintiff's PCSPA claim.

That stated, however, Scandale is likewise not entitled to summary judgment on the issue of damages under the PCSPA because genuine issues of material fact exist as to whether the Subcontract effectively disclaimed recovery of damages available under the PCSPA and whether Scandale has satisfied the requirements to recover under the PCSPA.

Genuine issues of material fact exist as to whether the Subcontract effectively disclaimed recovery of damages available under the PCSPA. Initially, Bell argues that the Subcontract excludes the PCSPA's penalty and interest provisions. (See Rec. Doc. 1-3, Ex. A, ¶¶ 1, 22). Bell also notes that paragraph nineteen (19) of the Subcontract affords time as the exclusive remedy in the event of delay. (See Rec. Doc. 1-3, Ex. A, ¶ 19).

Further, for a subcontractor to be entitled to the remedies under the PCSPA, the subcontractor must perform in accordance with the provisions of the contract. 73 P.S. § 507(a). Thus, Bell also argues that Scandale has not performed in accordance with the provisions of the Subcontract. First, Bell argues that Scandale admitted not submitting a signed the Final Waiver and Release with its application

---

[1] That is, plaintiffs who have not brought a Miller Act claim and who may now be time-barred would be left without a remedy.

for final payment.  (See Rec. Doc. 48-15, Ex. 11 at 39).  Second, Bell also argues

that Scandale has failed to provide proof that it has paid all of its bills for work

Scandale performed under the contract, as required by paragraph three (3) of the

Subcontract.  (See Rec. Docs. 48-1 at 13; 1-3, Ex. A, ¶ 3).

However, Scandale maintains that the Subcontract did not effectively waive

PCSPA remedies.  Further, Scandale argues that it has performed in accordance

with the contract provisions, noting that Bell has not provided Scandale any notice

of deficiency since August 2003, the date of substantial completion and acceptance

by the FBOP.  (See Rec. Doc. 53 at 8-9).

### B.    Delay and Impact Damages Claim

With regard to Plaintiff's claim for delay and impact damages, Bell argues

that it is entitled to summary judgment because there is no genuine issue of

material fact and Scandale is not entitled to those damages as a matter of law due

to the delay damages waiver in the Subcontract.  Bell notes that the Third Circuit

has held that "[c]ertainly a contract may validly provide that a contractor shall be

entitled to no relief except an extension of the time of performance if

circumstances beyond his control shall delay his performance, even though such

delay does in fact increase his costs."  Lichter v. Mellon-Stuart Co., 305 F.2d 216,

218 (3d Cir. 1962).  Because the subcontract in Lichter complained that he was

ordered to proceed with work too soon, the Third Circuit goes on to say, in dicta, that "[s]uch a clause might preclude damages . . . if it were the subcontractor's essential complaint that [his] performance had been made more costly because he was required to postpone his operations."  Id.

Although at first glance, Lichter's dicta appears applicable here, some of Scandale's allegations may suggest that because of the delays and resulting conditions at the Project, it was ordered to proceed too soon and, in fact, never given the option of an extension of any duration.  For example, Scandale has indicated that Bell's December 21, 2001 Memorandum from the Project Manager of the Project to Scandale and other subcontractors stated that "extending your finish date is not an option."  (Rec. Doc. 51, Ex. 6).  Reasonable minds could thus conclude that Scandale was forced to proceed in such a manner that caused it to suffer its alleged substantial impact costs above the original contract price.

Plaintiff also argues that summary judgment should be granted in its favor as to its delay damages claim because there is no genuine issue of material fact and Plaintiff is entitled to those damages as a matter of law where Bell's conduct substantially interfered with Scandale's performance.  (Rec. Doc. 53 at 11).  Scandale counters Bell's argument that the Subcontract expressly waived delay damages by asserting that Bell's actions render the Subcontract waiver ineffective.

(Rec. Doc. 53 at 12).

Scandale argues that in Pennsylvania, "exculpatory provisions in a contract cannot be raised as a defense where (1) there is an affirmative or positive interference by the owner with the contractor's work, or (2) there is a failure on the part of the owner to act in some essential matter necessary to the prosecution of the work." Grimme Combustion, Inc. v. Mergentime Corp., 595 A.2d 77, 82 (Pa. Super. Ct. 1991) (citing Gasparini Excavating Co. v. Pennsylvania Turnpike Comm'n, 187 A.2d 157 (Pa. 1963)).  Scandale alleges that many acts and/or omissions by Bell resulted in delays and, thus, damages to Scandale.  Scandale also relies on Universal Builders, Inc. v. Moon Motor Lodge, Inc., 244 A.2d 10, 15 (Pa. 1968), which states that "[c]onstruction contracts typically provide that the builder will not be paid for extra work unless it is done pursuant to a written change order, yet courts frequently hold that owners must pay for extra work done at their oral direction."

This Court recognizes that neither Grimme nor Universal Builders is directly on point because each addresses owner misconduct and owner instruction, respectively, and Scandale is alleging Bell, not FBOP, misconduct and instruction. Nevertheless, the Court agrees that Bell's misconduct or orders to complete additional work may, by analogy, have a similar effect as when those actions are

28

undertaken by an owner.  Further, Scandale has alleged that Bell orally agreed to

pay Scandale's impact/acceleration costs and requested submission of those costs.

(Rec. Doc. 51, Ex. 2, ¶ 22).  Consequently, Scandale's delay damages may not

have been waived by the Subcontract.

However, whether Bell's actions did, in fact, waive the Subcontract waiver

remains a disputed genuine issue of material fact.  Scandale asserts that Bell's

many alleged acts and/or omissions, as well as failure to extend construction

schedules, resulted in substantial damages to Scandale.  (Rec. Doc. 50 at 7, ¶ 24).

Scandale cites a non-exclusive list of twelve alleged acts or omissions by Bell,

including such items as earthwork delays resulting in shut down from June 18,

2001 through August 8, 2001, change in performance conditions, re-sequencing of

work areas, and failure of Bell to properly supervise and coordinate the work of all

subcontractors.  (Rec. Doc. 50, ¶ 23).

Several of Scandale's exhibits lend support to its allegations.  In his

affidavit, Mark Paradise, the secretary of Scandale, claims that upon Scandale's

commencement of work on the Project on May 1, 2001, Scandale:

> immediately encountered problems including but not limited to hindrances
> and obstructions, substantial additional work requirements, earthwork delays
> and stop work orders, out of sequence scheduling, etc., all of which
> disrupted the Plaintiff's performance time and efficiency and frustrated
> Plaintiff's ability to complete the project work in the manner it was
> originally bid.

(Rec. Doc. 51, Ex. 2, ¶ 7).  Mr. Paradise indicates that these various on-site problems resulted in a twenty-six (26) week delay in the Project.

Further, Mr. Paradise states that as a result of that and other delays (doc. 51, Ex. 2, ¶ 9), as well as Bell's December 21, 2001 Memorandum from the Project Manager of the Project to Scandale and other subcontractors indicating that "extending your finish date is not an option" (doc. 51, Ex. 6), Scandale suffered substantial impact costs above the original contract price.  Mr. Paradise also indicates that Bell orally agreed to pay Scandale's impact/acceleration costs and requested submission of those costs.  (Rec. Doc. 51, Ex. 2, ¶ 22).  Thus, Mr. Paradise claims that at the request of Bell, Scandale submitted an initial Request for Equitable Adjustment Financial Summary, which provides that it does not include any unpaid balance due on the Subcontract or any unpaid retainage being held by Bell, and requests an additional $1,441,089.  (Rec. Doc. 51, Ex. 5).

However, Bell denies Scandale's allegations that Bell is responsible for the delays, arguing that Scandale's allegations are unsupported by the record and that Scandale and other actors caused some of the delays.  (Rec. Doc. 59, ¶ 23).  Bell also claims that Scandale was not precluded from working during the earthwork shutdown, and that, in fact, Scandale continued to construct footings during the alleged shutdown.  (Rec. Doc. 59, ¶ 23).

As previously referenced, the report prepared by Bell's expert, Patrick W. Brannon, P.E., lends some support to Bell's denials.  Mr. Brannon suggests that Scandale's allegations are unfounded.  (See Rec. Doc. 59-5, Ex. 3 at 10-17).  He notes that Bell provided Scandale all of the time necessary to perform their work, that Scandale waived delay damages under the Subcontract, and that Bell has not received compensation from the FBOP for delays associated with the earthwork stoppage.  (Rec. Doc. 59-5, Ex. 3 at 11).  Further, Mr. Brannon indicates that Scandale has not demonstrated how a 57 day work stoppage resulted in a 411 day delay, and that, in fact, Bell afforded Scandale the opportunity to work on multiple aspects of the Project concurrently to make up time, but that Scandale failed to take advantage by not providing sufficient workers or supervision.  (Rec. Doc. 59-5, Ex. 3 at 11-12).

Thus, after a careful review of the record, we conclude that read in the light most favorable to the nonmoving parties, substantial and genuine issues of material fact exist as to whether Scandale is entitled to delay and impact damages. Reasonable minds could differ as to whether Bell's actions and/or omissions (doc. 51, Ex. 2) constituted sufficient "affirmative or positive interference" or "a failure . . . to act in some essential matter necessary to the prosecution of the work." Grimme Combustion, Inc., 595 A.2d at 82 (citing Gasparini Excavating Co., 187

A.2d 157).  Reasonable minds could also differ as to whether Bell ordered changes in Scandale's performance of the contract and orally agreed to pay Scandale's impact/acceleration costs.  (Rec. Doc. 51, Ex. 2, ¶ 22).  Thus, summary judgment on Plaintiff's delay damages claim is inappropriate.

### C.     <u>Conclusion</u>

In summary, for the ample reasons set forth herein, Plaintiff's Motion for Summary Judgment (doc. 49) and Defendant's Motion for Partial Summary Judgment (doc. 47) are denied.  With regard to Plaintiff's claims for damages under the PCSPA, summary judgment for Defendant is inappropriate because as a matter of law, we hold that the Miller Act does not preempt the PCSPA, and the ambiguity of the definition of "person" within the PCSPA leaves open the possibility that the FBOP falls within the definition of "owner."  Plaintiff is also not entitled to summary judgment under the PCSPA because genuine issues of material fact exist as to whether the Subcontract effectively disclaimed certain PCSPA damages and whether Scandale has satisfied the requirements to recover under the PCSPA.

Additionally, summary judgment is also inappropriate on Plaintiff's delay damages claim because genuine issues of material fact exist as to whether Bell's actions waived the delay damages provision in the Subcontract.

**NOW, THEREFORE, IT IS ORDERED THAT:**

1.      Defendant Bell's Motion for Partial Summary Judgment (doc. 47) is

denied.

2.      Plaintiff Scandale's Motion for Summary Judgment (doc. 49) is

denied.

s/ John E. Jones III
John E. Jones III
United States District Judge
