IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SCANDALE ASSOCIATED | : | |
| BUILDERS & ENGINEERS, LTD., | : | |
| | : | |
| Plaintiff, | : | No.  4:03-CV-1773 |
| | : | |
| v. | : | (Judge Jones) |
| | : | |
| BELL JUSTICE FACILITIES | : | |
| CORPORATION, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM AND ORDER

### April 4, 2007

## THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

The instant action arises out of a subcontract that Plaintiff Scandale

Associated Builders & Engineers, Ltd. ("Plaintiff" or "Scandale"), entered into with

Defendant Bell Justice Facilities Corporation ("Defendant" or "Bell"), for work on

the construction of the United States Penitentiary/Federal Prison Camp at Canaan,

Pennsylvania.

Scandale initiated this action by filing a four-count Complaint against Bell in

the Court of Common Pleas of Wayne County, Pennsylvania, on or about

September 10, 2003.  On October 6, 2003, pursuant to 28 U.S.C. § 1446,

Defendant filed a Notice of Removal with this Court.  That same day, Defendant

1

filed a Motion to Dismiss Count III of the Complaint, which was granted by this Court's Order of December 5, 2003.  (Rec. Doc. 12).  Following our December 5, 2003 Order, the following claims remained viable: a breach of contract claim in Count I, a delay and impact costs claim in Count II, and a Pennsylvania Contractors and Subcontractors Payment Act ("PCSPA") claim in Count IV.  See 73 Pa. C.S.A. § 501, et seq.

On October 11, 2006, this Court issued an Order denying Bell's Motion for Partial Summary Judgment (doc. 47) and Scandale's Motion for Summary Judgment (doc. 49).  (Rec. Doc. 76).

Accordingly, from February 12, 2007 to February 13, 2007, and from February 20, 2007 to February 21, 2007, Plaintiff presented its case in a non-jury trial.[1]  Defendant indicated, during the course of trial, that it intended to file a Motion for Judgment as a Matter of Law under Rule 52(c) of the Federal Rules of Civil Procedure ("Rule 52 Motion" or "Motion") at the close of Plaintiff's case, and, indeed, it so moved.  (See Rec. Docs. 107, 110).  Thus, following the close of Plaintiff's case-in-chief, we entered an Order requiring briefing on the instant Motion.[2]  (Rec. Doc. 108).

---

[1] Defendant is scheduled to begin the presentation of its case on April 16, 2007.

[2] We are cognizant that the parties' briefs request oral argument on the instant Motion, but in light of the parties' through analyses of the dispositive issues in their briefs, we find argument thereupon to be unnecessary.

In Bell's Motion and the briefing in support thereof, Bell concedes that Scandale is entitled to judgment as a matter of law on its breach of contract claim in Count I, in the amount of $287,307.  (<u>See</u> Rec. Doc. 110-2 at 1, 30).  However, Bell contends that it is entitled to judgment as a matter of law on Scandale's other claims: Count II's delay and impact costs claim, and Count IV's PCSPA claim. Accordingly, Bell asks that this Court enter judgment in Scandale's favor for the outstanding contract balance of $287,307.  (Rec. Doc. 110-2 at 1).

Scandale's Brief in Opposition to the instant Motion denies that Bell is entitled to judgment as a matter of law on its claims in Counts II and IV.  (Rec. Doc. 111).

## STANDARD OF REVIEW:

Rule 52(c) provides that "[i]f during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim . . . that cannot under the controlling law be maintained . . . ."  Fed. R. Civ. P. 52(c). In entering judgment pursuant to Rule 52(c):

> the court is not limited in its evaluation of the nonmovant's case as it would be on a motion for a directed verdict.  The trial judge is not to draw any special inferences in the nonmovant's favor nor concern itself with whether the nonmovant has made out a prima facie case. Instead, the court's task is to weigh the evidence, resolve any conflicts in it, and decide for itself where the preponderance lies.

Giant Eagle, Inc. v. Fed. Ins. Co., 884 F. Supp. 979, 982 (W.D. Pa. 1995) (citing

9A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure: Civil 2d,

§ 2573.1).  See also United Techs. Corp. v. Chromalloy Gas Turbine Corp., 105 F.

Supp. 2d 346 (D. Del. 2000).

Having considered the sufficiency and weight of the testimony presented at

trial, the character and appearance of the witness who testified, the exhibits

admitted into evidence, and the briefs submitted by the parties, the Court finds that

Scandale is entitled to judgment as a matter of law on Count I, and that Bell  is

entitled to judgment as a matter of law on Count II, but not on Count IV.  We enter

the following findings of fact and conclusions of law as required by Fed. R. Civ. P.

52(a).

**FINDINGS OF FACT:**

1.      On or about January 4, 2001, Scandale and Bell entered into a written

        subcontract agreement ("Subcontract"), whereby Scandale agreed to

        perform the cast-in-place concrete work on the United States

        Penitentiary/Federal Prison Camp at Canaan, Pennsylvania ("Project"),

        for which Bell was the general contractor and the United States of

        America, through the Federal Bureau of Prisons ("BOP"), was the

        owner.  The original sum of the Subcontract was $5,413,000.  (Rec.

        Docs. 110-2, ¶ 1; 111, ¶ 1).

4

2.      The Subcontract contains several provisions governing the general

        process by which Scandale was to be paid:

        i.      Paragraph 3 conditions Bell's payments to Scandale under the

                contract upon several items:

If [the] Subcontractor shall well and faithfully fulfill this contract to the
satisfaction of the Contractor and Architect, [the] Contractor will pay
to the Subcontractor the total sum of **FIVE MILLION, FOUR
HUNDRED THIRTEEN THOUSAND, DOLLARS AND NO
CENTS ($5,413,000.00)**, for all work and material in place if
completed and accepted under this contract; partial payments to be
made on account of said total sum, on or about the 5th day following
receipt by [the] Contractor, at the rate of 90 percent, of the value of
the work erected in place during the preceding month as determined
by the Contractor, Owner and Architect and the remaining 10 per cent,
within 30 days after the completion and acceptance of the work by the
Contractor, Owner and Architect; provided that [the] Subcontractor
shall have paid in full all bills for labor and materials and <u>if requested
by [the] Contractor shall submit evidence thereof</u>; but at no time shall
[the] Contractor be required to make any payments which will reduce
the difference between the contract price and the amount paid below
an amount sufficient in the opinion of [the] Contractor to complete the
work herein provided for.  No payment made under this contract shall
operate as an admission on the part of [the] Contractor that this
contract or any part there of has been complied with nor relieve [the]
Subcontractor from liability for the faithful performance of all the
terms and conditions hereof.

[The] Contractor may retain from monies owing by it to [the]
Subcontractor sufficient sums to indemnify it against losses, liabilities
or obligations for which, as between Contractor and Subcontractor,
the latter is liable under the subcontract.

. . .

5

(Pl.'s Exh. 29, ¶ 3 (emphasis added)).

ii.      Paragraph 13 of Supplement "B" provides: "Subcontractor shall sign and return on a <u>monthly</u> basis Waiver Of Lien Forms."  (Pl.'s Exh. 29, Supp. "B," ¶ 13 (emphasis added)).

3.      The Subcontract also contains provisions governing the conditions under which Scandale's work on the Project could be changed and the compensation therefor:

i.      In relevant part, Paragraph 19 provides:

The Subcontractor expressly agrees not to make, and hereby waives, any claim for damages on account of any delay, obstruction or hindrance for any cause whatsoever . . . and agrees that its sole right and remedy in the case of any delay, obstruction or hindrance shall be an extension of the time fixed for completion of work <u>unless and to the extent that the Contractor recovers the same from the Owner</u>.

 (Pl.'s Exh. 29, ¶ 19 (emphasis added)).

ii.      Paragraph 9 provides:

The Contractor shall have the right to order the Subcontractor to work overtime in order to expedite the final completion of the work and it is agreed that for such overtime the Contractor shall pay only the actual excess cost of the labor of the labor over the regular time rate, plus liability insurance and social security tax thereon.  Should it be necessary, in the Contractor's opinion, for the Subcontractor to work overtime, due to failure on his part to keep up with the general progress of the work, then the Subcontractor shall work overtime and the entire cost so incurred shall be borne by him.

(Pl.'s Exh. 29, ¶ 9).

iii.       Paragraph 10 provides:

[The] Contractor may at any time during the progress of the work
require any deviation from, addition to or omission in the plans or
specifications without giving notice to the surety hereinafter required
and [the] Subcontractor agrees to make such changes of whatever
character they may be as part of this subcontract; and in case changes
shall make the work more or less expensive than that originally
required, a proportionate addition or deduction shall be made in the
contract price herein as agreed upon between parties hereto and, in the
event they cannot agree then as determined by the Owner and
Architect whose decision as to price and as to additional time to be
allowed shall be final without appeal.  No claim shall be made for extra
work or materials, unless [the] Contractor orders [the] Subcontractor
to do such extra work or furnish such extra materials, in writing signed
by [the] Contractor setting forth the nature of such extra work and
materials and the cost thereof <u>unless and to the extent that the
Contractor recovers the same from the Owner</u>.

(Pl.'s Exh. 29, ¶ 10 (emphasis added)).

4.     Notably, the Subcontract contained no provision outlining the date on

which Scandale's work thereunder was to be completed.  (Rec. Docs.

110-2, ¶ 8; 11, ¶ 5; <u>see also</u> Pl.'s Exh. 29).

5.     Although Scandale started its work on the Project on May 1, 2001,

and planned completion thereof by May of 2002 (doc. 103 at 52-53,

99-100), Scandale's work on the Project was not complete until July 1,

2003, more than a year later (doc. 103 at 138).

6.     The parties disagree as to an exhaustive list of the delay's causes, but

they agree that it was due in part to the suspension of the earthwork on the Project on two different occasions: from June 4, 2001 through June 8, 2001, and from June 18, 2001 through August 8, 2001.  (Rec. Docs. 81, ¶¶ 8-9; 107 at 71-73).  This 54-day shutdown ("earthwork shutdown" or "shutdown") was due to stop work orders issued by state and federal agencies in order to ensure the earthwork's regulatory compliance.  (Rec. Docs. 81, ¶¶ 8-9; 107 at 71-73; 110-2, ¶ 5).

7.      The earthwork shutdown caused delay beyond the 54-day period because it led Bell's earthwork subcontractor, Popple, to abandon the Project.  (Rec. Doc. 103 at 185).

8.      Mark Paradise, a partner in Scandale and Scandale's sole witness, testified that Scandale's work was also delayed because of Bell's actions and inactions, including: not issuing a Project Schedule until December 26, 2002 (Pl.'s Exh. 17; doc. 103 at 89); not timely replacing the original earthwork subcontractor, Popple (doc. 103 at 42); re-sequencing Scandale's work (doc. 103 at 87, 89); and providing numerous, untimely redesigns (docs. 102 at 20, 103 at 74-75).

9.      During the course of Scandale's work on the Project, Scandale executed approximately twenty-five (25) monthly releases.  (See Def.'s

Exhs. 15-37).

10.     Prior to September of 2001, these releases were entitled

"Subcontractor or Supplier Partial Lien and Claim Waiver and

Affidavit," and the relevant provision thereof read:

> In consideration of the payment herewith made, the undersigned does fully and finally release and hold harmless **BELL JUSTICE FACILITIES CORP.**, it surety, if any, and the Owner through the above date from any and all claims, liens or right to claim or lien arising out of this Project under any applicable bond, law or statute.

(<u>See</u>, <u>e.g.</u>, Def.'s Exh. 15).

11.     However, by September of 2001, the title of the releases and the

content thereof changed.  The new releases were entitled

"Subcontractor Release and Waiver of Claims and Affidavit," and

they included more comprehensive waiver language:

> In consideration of the payment herewith made, the Undersigned does fully and finally release and waive any and all claims, causes of action, and/or lien rights against the Contractor, its Surety, and the Owner for all costs, expenses, or losses of any nature or description which have arisen or are in any manner related to any aspect of the Work Items from the date the Work Items originally commenced to the date payment is made hereunder.  This Release and Waiver applies to all claims, disputes, and other matters though [sic] the date this payment is made, including all claims for direct and indirect costs, impacts inefficiencies, productivity losses, delays, accelerations, ripple effects, field and home office overhead, equipment costs, and all other consequential and incidental costs, losses, and/or damages.

(<u>See</u>, <u>e.g.</u>, Def.'s Exh. 18).

12.    Before Scandale realized that Bell had changed the release language, Mark Paradise executed two of the latter releases, in September of 2001 and October of 2001.  (Def.'s Exhs. 18, 19).

13.    Thereafter, specifically, in the releases dated November of 2001 through July of 2003, Scandale attempted to reserve its rights by adding language at the end of each release excepting waiver of claims as to "all outstanding change order requests and delayed impact costs associated with June 2001 shutdown (amount yet to be determined)." (See, e.g., Def.'s Exh. 21).

14.    Also during the course of Scandale's work on the Project, a series of Change Orders were executed by the parties as a result of the delays in the Project, in accordance with paragraph 10 of the Subcontract. (See, e.g., Def.'s Exh. 2).

15.    In order for Scandale to be paid in the amount provided in Change Order 11, the final Change Order executed and the one most pertinent to our discussion here, Mark Paradise had to sign it without modification.  (Rec. Doc. 107 at 52).

16.    Thus, on July 8, 2003, Mark Paradise signed Change Order 11.

(Def.'s Exh. 8).  The relevant portion of Change Order 11 specifically

provides:

> This change order also provides complete and final payment for all
> bulletins and contract document postings to date including but not
> limited to bulletin nos. 1 through 250, final issue 10/26/00 drawings
> and specifications and returned submittal comments.
> This change order represents full and final settlement for time and
> money for the work required in this change, including all delays, labor
> inefficiency and other impact costs associated with this change.  The
> subcontractor hereby releases the contractor from any and all liability
> under this subcontract for further equitable adjustment attributed to
> such factors or circumstances giving rise to this modification.

(Def.'s Exh. 8 at 3).

16.    As noted above, Scandale's work on the Project was essentially

complete by July 1, 2003.  Accordingly, also around this time,

Scandale submitted its "Final Application and Certification for

Payment" to Bell, seeking payment of the final contract balance,

$287,307.64, at least twice.  (See, e.g., Pl.'s Exh. 175).

17.    Bell refused to pay Scandale the final contract balance unless and until

Scandale signed a final waiver releasing all of its claims.  (Rec. Docs.

105 at 50; 110-2 at 26).

18.    For example, via a letter dated August 19, 2003, Bell offered to pay

Scandale the $287,307 contract balance, as well as $175,000 to settle

all of Scandale's claims arising out the delays associated with the earthwork shutdown and ensuing problems, on the condition that Scandale sign a final waiver of all claims.  (Pl.'s Exh. 126).

19.   Scandale was given only one (1) day to consider the settlement offer. (Pl.'s Exh. 126).

20.   Although Bell knew of an outstanding claim by one of Scandale's subcontractors, Mid-Valley, as early as October of 2002 (see Def.'s Exh. 128), the limited record before us presents no evidence that this potential claim was articulated by Bell as a justification for its repeated demands for a final waiver from Scandale.

21.   Indeed, contrary to Bell's assertions in its briefing (see, e.g., doc. 110-2 at 10), no provision within the Subcontract explicitly required that Scandale execute a so-called final waiver before Bell's payment of the contract balance became due.

22.   As the instant action makes clear, Scandale declined Bell's August 19, 2003 settlement offer.

## CONCLUSIONS OF LAW:

In support of the instant Motion, Bell argues that eight (8) independent grounds entitle it to judgment as a matter of law on Count II, the delay and impact

costs claim, and Count IV, the PCSPA claim.  In response, Scandale argues that "the eight (8) legal grounds upon which Defendant relies are baseless, [they] blatantly and intentionally misconstrue evidence and are contrary to the existing case law in the Third Circuit and Pennsylvania."  (Rec. Doc. 111 at 1).  For the sake of clarity, we will outline and consider the parties' contentions as to each Count in sequence.

## I.    Count II: Scandale's Claim for Delay and Impact Damages

With regard to Count II, Bell contends that five (5) grounds entitle it to judgment as a matter of law: 1) the "no damages for delay" provision in the Subcontract is enforceable; 2) Change Order 11 constitutes a full accord and satisfaction; 3) twenty-five (25) releases signed by Scandale waive all claims for work performed through June 30, 2003; 4) Scandale failed to establish that Bell caused the damages Scandale seeks; and 5) Scandale failed to establish damages. (Rec. Doc. 110-2 at 2-4).  Scandale counters each of Bell's arguments as to Count II as follows:[3] 1) the "no damages for delay" provision of the Subcontract is unenforceable because exceptions thereto in Pennsylvania's case law apply; 2) no accord and satisfaction occurred when Scandale executed Change Order 11 because the circumstances surrounding the execution demonstrate that Scandale

---

[3] The numbering of Scandale's counter-arguments corresponds with the numbering of Bell's arguments regarding each Count, here and in the parties' briefs.  (See Rec. Docs. 110-2, 111).

wished to preserve its claims; 3) two of the specific releases upon which Bell relies were "not contemplated or required by the Subcontract, were not supported by additional consideration and were obtained by BELL after Scandale unknowingly executed them;" 4) in spite of the absence of expert testimony, Scandale established that Bell caused Scandale's damages; and 5) Scandale proved that it incurred damages.  (Rec. Doc. 111 at 1-2).

We begin our consideration of Count II by taking each of these arguments in turn.  First, when evaluating the enforceability of the "no damages for delay" clause in paragraph 19 of the Subcontract (Pl.'s Exh. 29, ¶ 19), we recognize, as did the parties (docs. 110-2 at 12-13; 111 at 7-9), that in Pennsylvania, such exculpatory provisions will not be enforced if one (1) of at least two (2) conditions apply.  As the Superior Court of Pennsylvania held in Grimme Combustion, Inc. v. Mergentime Corp., 595 A.2d 77 (Pa. Super. Ct. 1991), such provisions will not be enforced when either: 1) the owner or general contractor[4] affirmatively interferes with a contractor's work; or 2) the owner or general contractor fails to act in some

---

[4] Although Bell contends that "no damages for delay" provisions are unenforceable only if the owner interferes or fails to act, Grimme clearly extends this rule to general contractors' interference or failure to act.  Id. at 83.  Accordingly, our colleagues in the Eastern District of Pennsylvania have recognized this extension.  See ILM Sys. v. Suffolk Constr. Co., 252 F. Supp. 151, 157 ("Under Pennsylvania law, an exculpatory clause . . . does not bar claims by a subcontractor for delays that are caused by interference or material omissions of a general contractor."); Allied Fire & Safety Equip. Co. v. Dick Enters., Inc., 972 F. Supp. 922, 934 (E.D. Pa. 1995) ("if [the subcontractor] can show that [the general contractor] affirmatively interfered with [the subcontractor's] performance of the contract, [the subcontractor] can recover for the damages resulting from [the general contractor's] delay.").

"essential matter necessary to the prosecution of the work."  Id. at 82-83.

In light of these exceptions to the enforceability of "no damages for delay" provisions and the evidence that Scandale presented in its case-in-chief, we cannot grant Bell's Rule 52 Motion on this ground.  Indeed, we have before us abundant evidence suggesting that Bell both failed to act in essential matters and actively interfered with Scandale's work.  Scandale has presented evidence that following the earthwork shutdown, Bell failed in essential matters by not issuing a Project Schedule until December 26, 2002 (Pl.'s Exh. 17; doc. 103 at 89), and by not timely replacing the earthwork subcontractor, Popple, who left the job following the shutdown (doc. 103 at 42).  Scandale also presented evidence that Bell actively interfered with Scandale's work by re-sequencing Scandale's work (doc. 103 at 87, 89), and by providing numerous, untimely redesigns (docs. 102 at 20, 103 at 74-75).

Thus, we turn to Bell's second argument, the legal significance of Change Order 11.  This Change Order was signed by Scandale representative, Mark Paradise, on July 8, 2003; it increases the Subcontract's value by $334,688, to $5,747,688, and contains comprehensive release language.  (Def.'s Exh. 8 at 3).  Accordingly, as Scandale accurately indicated (doc. 111 at 10), because releases are considered contracts under Pennsylvania law, interpretation of Change Order 11 is governed by contract law.  G.R. Sponaugle & Sons, Inc. v. Hunt Constr.

15

Group, Inc., 366 F. Supp. 2d 236, 242 (M.D. Pa. 2004).

Although the parties agree that contract law governs resolution of this issue, they, not unexpectedly, differ in their views of its application here.  In support of its Rule 52 Motion, Bell argues that Change Order 11 constitutes an "accord and satisfaction of any and all delay and extra work claims by Scandale."  (Rec. Doc. 110-2 at 14).  In the main, Scandale argues that Change Order 11 is not an enforceable accord and satisfaction because the circumstances surrounding the execution thereof are admissible, and they reveal that, despite the language in Change Order 11, Scandale did not intend to release its entire claim for delay damages.  (Rec. Doc. 111 at 14).  Scandale also appears to argue, in the alternative, that even if we find that Change Order 11 constitutes an enforceable release, "the release language in Change Order 11 is limited to 'the work required in this change.'"  (Rec. Doc. 111 at 14).  In its Reply Brief, Bell argues that Scandale's intent argument is contrary to this Court's ruling at trial, which sustained Bell's parol evidence objection to the admission of evidence that would alter or contradict Change Order 11, and, hence, we should not entertain Scandale's argument.  (Rec. Doc. 112 at 5-6).

As the parties' arguments portend, to determine whether Change Order 11 constitutes a full "accord and satisfaction" (doc. 110-2 at 14), we must consider the application of the parol evidence rule, which provides:

> Where the parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement.  All preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract . . . and unless fraud, accident, or mistake be averred, the writing constitutes the agreement between the parties, and its terms and agreements cannot be added to nor subtracted from by parol evidence.

Yocca v. Pittsburgh Steelers Sports, Inc., 854 A.2d 425, 436 (Pa. 2004).  Further, as a colleague from this Court so aptly stated when considering a release, "assuming the language is clear and unambiguous, the court looks no further than the language in interpreting the release, even if the language is broad or general, and no matter how 'improvident' the agreement may later prove to be for one of the parties."  G.R. Sponaugle & Sons, Inc., 366 F. Supp. 2d at 242 (citations omitted).  Indeed, our colleague went on to explain why Scandale's instant argument, in favor of consideration of the circumstances surrounding execution of Change Order 11, fails:

> Sometimes courts interpreting the scope of a release speak of factors apart from the language of the release being relevant to its interpretation, such as what was within the parties' contemplation at the time, or the circumstances surrounding the execution of the release.  However, when the language is clear and unambiguous, these considerations are controlled by the language of the release itself.

Id. at n.6 (citations and explanatory parentheticals omitted).[5]

Thus, because Scandale has neither argued nor shown fraud, accident, or mistake associated with the execution of Change Order 11, we must determine whether the terms of the Change Order are ambiguous.  Change Order 11 provides:

> This change order also provides <u>complete and final payment</u> for all bulletins and contract document postings to date including but not limited to bulletin <u>nos. 1 through 250</u>, final issue 10/26/00 drawings and specifications and returned submittal comments.
> This change order represents full and final settlement for time and money for the work required in this change, including all delays, labor inefficiency and other impact costs associated with this change.  The subcontractor hereby releases the contractor from any and all liability under this subcontract for further equitable adjustment attributed to <u>such factors or circumstances giving rise to this modification</u>.

(Def.'s Exh. 8 at 3 (emphasis added)).  In short, we see no ambiguity to justify consideration of the circumstances preceding Change Order 11's execution:

Scandale's work on the Project was essentially complete by July 1, 2003 (doc. 103

_____

[5] We have thoroughly considered the authority cited by Scandale in support of its position on this issue, and we have concluded that the cases cited are either distinguishable or they do not stand for the proposition for which they are cited.  For example, in <u>Seasor v. Covington</u>, 670 A.2d 157, 159 (Pa. Super. Ct. 1996), the court explicitly indicated that "[i]t is well settled that the effect of a release must be determined from the ordinary meaning of its language.  When construing agreements such as releases that involve clear and unambiguous terms, the court need only examine the writing itself to give effect to the parties' understanding."

Moreover, Scandale's argument that Bell's subsequent requests for Scandale's delay damages should be considered a waiver of Scandale's release in Change Order 11 (doc. 111 at 11 n.1) also fails because paragraphs 10 and 19 of the Subcontract demonstrate that Bell made such requests pursuant to the Subcontract, which provided that such requests would be entertained to the extent Bell recovered from BOP.

at 52-53), and bulletins 1 through 250 covered all changes that Bell made to Scandale's work through the course of the Project (doc. 112 at 6).  As Change Order 11 is unambiguous as to the release's scope, the parol evidence rule prevents consideration of the circumstances that preceded, or were contemporaneous with, Scandale's execution thereof, and Change Order 11 operates as an enforceable release of all of Scandale's delay damages.

In addition, we find unpersuasive Scandale's alternative argument that "the release language in Change Order 11 is limited to 'the work required in this change.'"  We so find because Change Order 11 plainly says 1) that it is "complete and final payment" for bulletins 1 through 250, which comprise all of the bulletins that covered changes in Scandale's work; and 2) that "[the] subcontractor hereby releases the contractor from any and all liability under this subcontract for further equitable adjustment attributed to <u>such factors or circumstances giving rise to this modification</u>."  (Def.'s Exh. 8 at 3 (emphasis added)).  By signing Change Order 11, Scandale waived its rights to all damages related to the changes in its work prior to the date of execution.

Our conclusion that Change Order 11 constitutes an enforceable waiver of all of Scandale's alleged delay damages necessarily entitles Bell to judgment as a

matter of law on Count II.[6]  Thus, we need not analyze any of Bell's additional three (3) arguments in support thereof.

## I.      Count IV: Scandale's Claim pursuant to the PCSPA

As Bell has conceded that Scandale is entitled to judgment as a matter of law on Count I, in the amount of the Subcontract balance, $287,307, we must consider the viability of Count IV.  Bell contends that it is entitled it to judgment as a matter

of law with respect to Count IV on three (3) grounds: 1) the PCSPA does not apply because the Subcontract required a final waiver, Scandale never submitted such waiver, and, thus, payment under the contract has not yet become due; 2) even if the PCSPA applies, Bell complied with the PCSPA when it tendered to Scandale the $287,307 contract balance on August 19, 2003; and 3) even if the PCSPA applies and Bell's August 19, 2003 tender does not bring it in compliance therewith, Bell's actions were undertaken in good faith, and, thus, qualify it for the good faith exception to the PCSPA's penalties.  (Rec. Doc. 110-2 at 4-5). Scandale counters Bell's arguments as to Count IV as follows: 1) the PCSPA

---

[6] Our holding as to Count II does not signal endorsement of Bell's conduct vis-a-vis its subcontractor Scandale.  Indeed, we find Bell's conduct to be both disturbing and oppressive. But the language of Change Order 11 is clear, and there was no fraud or mistake. Unfortunately for Scandale, Bell's lack of decorum cannot be utilized to save it from the waiver it signed. Moreover, when signing contracts, particularly those involving a project of the magnitude at issue here, contracting parties are presumed to understand the legal implications thereof.  Accordingly, Scandale cannot escape its waiver of the instant claim in Change Order 11.

applies because Bell breached the Subcontract as there was no contractual

provision requiring Scandale to sign a final release prior to final payment; 2) Bell's

tender in August of 2003 does not render it compliant with the PCSPA because the

tender was conditional; and 3) Bell's actions do not qualify it for any good faith

exception to the PCSPA because Bell's reliance upon the potential outstanding

claim by Mid-Valley, a subcontractor of Scandale, is an eleventh hour defense.

(Rec. Doc. 111 at 2-3).  Finally, each party puts forth a policy argument that

supports resolution of this issue in its favor.

 Our review of the record and the submissions as they relate to Count IV

leads us to conclude that it remains viable.  We so conclude because under § 504

of the PCSPA, a contractor or subcontractor is entitled to payment when it has

performed "in accordance with the provisions of a contract," 73 Pa. C.S.A. § 504,

and on this record, it would be premature to conclude that Scandale was not

entitled to payment on the Subcontract more than three and a half years ago, when

it substantially completed its work on the Project and signed the July 2003 monthly

release.  (See Rec. Doc. 103 at 138; Def.'s Exh. 37).

 We address each of the parties' three (3) arguments in turn.  First, no

Subcontract provision prevents the PCSPA from applying because the provisions

that Bell cites in support of its argument that the Subcontract required Scandale to

sign a final waiver prior to receipt of final payment (see Pl.'s Exh. 29, ¶ 3; Supp.

"B," ¶ 13) can not be read to require such waiver.  Simply stated, neither paragraph

3 of the Subcontract nor paragraph 13 of Supplement "B" to the Subcontract

mention, or even allude to, a final waiver.  Rather, the provision most nearly

requiring such a waiver, paragraph 13 of Supplement "B," indicates that

"Subcontractor shall sign and return on a <u>monthly</u> basis Waiver of Lien Forms."

(Pl.'s Exh. 29, Supp. "B," ¶ 13 (emphasis added)).  As evident by the twenty-five

(25) signed releases that Bell has entered into evidence, the last of which is dated

July 9, 2003, Scandale provided Bell these monthly waivers.  (<u>See</u> Def.'s Exhs. 15-

37).

      Second, the offer that Bell extended to Scandale on August 19, 2003, does

not render Bell in compliance with the PCSPA.  Bell's offer does not bring it in

compliance with the PCSPA because Scandale's receipt of the so-called tender

was predicated upon Scandale's signing of a "final change order," <u>i.e.</u>, a release

that was not required under the Subcontract for the reasons state above.  (<u>See</u> Pl.'s

Exh. 126).  Because Bell's imposition of this condition was not based upon the

Subcontract, this qualified offer is insufficient to bring Bell into compliance with the

PCSPA.

      Third, although a letter from Bell to Scandale, dated November 11, 2002,

demonstrates that Bell was aware of a potential claim by a subcontractor of

Scandale, Mid-Valley, as early as October or November of 2002 (<u>see</u> Def.'s Exh.

128), the record is bereft of evidence that this qualifies Bell for any good faith

exception to the PCSPA.  Indeed, there is no evidence that Bell specifically cited

the potential Mid-Valley claim when it repeatedly requested that Scandale sign a

final release, or that pursuant to ¶ 3 of the Subcontract, Bell requested proof that

Scandale had paid all of its bills for materials and labor.  (Pl.'s Exh. 29, ¶ 3).

Rather, Bell's true reason for its failure to pay the balance due Scandale is quite

clear on this record: Bell wanted Scandale to sign a "final waiver and release."  (See

Def.'s Exh. 128; Rec. Doc. 110-2 at 26).

Finally, in light of the foregoing discussion of Bell's alleged justifications for

its failure to pay Scandale the contract balance prior to this date, we decline to

grant Bell's Rule 52 Motion on the basis of its policy argument.  Indeed, we find

Bell's argument that the "[t]he equities in this case strongly dictate against an award

of interest and attorney's fees under the PCSPA" (doc. 110-2 at 29 (emphasis in

original)), to be incredible under these circumstances.  To the contrary, as Scandale

has argued, Bell's conduct appears to be "exactly the type of heavy-handed and

Draconian conduct that PCSPA was designed to prevent, and punish."[7] (Rec.

Doc. 111).  However, at this juncture, a judgment to that effect would be

premature, and, accordingly, we reserve final judgment on this issue until Bell has

---

[7] Indeed, we find ourselves wishing that we could award more than the PCSPA will allow to Scandale. However, for the reasons detailed herein we are unable to do so. This case regrettably proves Leo Durocher's aphorism to be correct: nice guys (at least sometimes) finish last.

been fully heard thereon.

**NOW, THEREFORE, IT IS ORDERED THAT:**

1.      Defendant's Rule 52(c) Motion for Judgment (doc. 110) is

        **GRANTED** in part and **DENIED** in part to the following extent:

        a.      The Motion is **GRANTED** to the extent that:

                I.      Scandale is entitled to judgment as a matter of law on

                        Count I, in the amount of $287,307; and

                ii.     Bell is entitled to judgment as a matter of law on Count II.

        b.      The Motion is **DENIED** in all other respects.

2.      A telephonic conference in this matter is hereby scheduled for April 9,

        2007, at 10:00 a.m., so that the parties and the Court may discuss the

        posture of this action.   Plaintiff's counsel shall initiate the conference

        call.  Chamber's telephone number is (570) 601-1497.




                                        s/ John E. Jones III
                                        John E. Jones III
                                        United States District Judge